U.S. District Court
for the District of Maryland
(Northern Division)

**Christopher Murdock, M.D.**
  c/o Flowers Keller LLP
  1601 Connecticut Avenue, NW
  Washington, D.C. 20009

      Plaintiff,

      v.

**Johns Hopkins University**
  3400 N. Charles Street
  Baltimore, MD 21218

**Johns Hopkins Health System Corporation**
  600 N. Wolfe Street
  Baltimore, MD 21205

**Jessica Bienstock, M.D.**
  5809 Silent Sun Place
  Clarksville, MD 21029

**James Ficke, M.D.**
  10715 Pot Spring Road
  Cockeysville, MD 21030

**Dawn LaPorte, M.D.**
  2 Hambleton Court
  Pikesville, MD 21208

**Adam Levin, M.D.**
  6905 Granite Ridge Court
  Baltimore, MD 21209

      Defendants.

Case No. _____

---

**Complaint and Request for Jury Trial**

---

Dr. Christopher Murdock brings this Complaint for damages against Johns Hopkins University ("JHU"), Johns Hopkins Health System Corporation ("JHHSC"), Dr. Jessica Bienstock, Dr. James Ficke, Dr. Dawn LaPorte, and Dr. Adam Levin, (collectively "the Defendants"), for violations of Title VII of the 1964 Civil Rights Act ("Title VII"); 42 U.S.C. § 1981; and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 et seq. This suit arises from the Defendants' wrongful termination of Dr. Murdock's employment with JHU.

## INTRODUCTION

1.      This is a case about what happens to a talented Black physician who dares to compete for a place in one of the most elite residency programs in American medicine. Dr. Christopher Murdock matched into the JHU orthopedic surgery residency program on the strength of his exceptional credentials and the promise of a distinguished career in a specialty that is among the most competitive and lucrative in medicine. What awaited him instead was a program riddled with anti-Black racism, a supervising physician with a reputation for racial bias, and an institutional leadership that acknowledged the problem but protected those responsible for it.

2.      From the moment Dr. Murdock arrived at JHU, he encountered a culture of racial exclusion. Before he had even begun his residency, multiple Black physicians warned him that the program had struggled to provide a welcoming environment for doctors who looked like him. Those warnings proved prescient. Dr. Adam Levin, a senior member of the department who held authority over residents' evaluations and careers, subjected Dr. Murdock to a sustained campaign

of racially motivated negative evaluations—including evaluations submitted during periods when the two had no professional contact—while other Black residents in the program suffered similar treatment.

3.      When Dr. Murdock formally complained about the racially disparate treatment he and other Black residents were experiencing, the response was swift and punishing—within days of his complaint, a cascade of negative evaluations from other attending physicians began to accumulate, ultimately leading to probation and a pretextual termination.

4.      The stated basis for Dr. Murdock's termination—a finding by JHU's Office of Institutional Equity ("OIE") that Dr. Murdock had touched two women over the clothes and made offensive comments to a third at a single off-campus social event—was applied in a manner unprecedented in its severity. No medical resident at JHU appears ever to have been terminated for comparable conduct without the imposition of lesser sanctions first. The decision to treat Dr. Murdock differently was not accidental. It was the culmination of a years-long campaign to push a Black physician out of a program that, as its own leadership acknowledged, was not a welcoming place for doctors like him.

5.      Dr. Murdock now brings this action to remedy those wrongs and to vindicate his right to compete for the opportunities his credentials earned him free from racial discrimination and retaliation.

## JURISDICTION AND VENUE

6.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 over Dr. Murdock's claims arising under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Dr. Murdock's claims arising under the Maryland Fair Employment Practices Act ("MFEPA").

7.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a "substantial portion of the events or omissions giving rise to" Plaintiff's claims "occurred" in this judicial district.

## EXHAUSTION

8.     Dr. Murdock filed charges with the Equal Employment Opportunity Commission ("EEOC"). On January 2, 2026, the EEOC issued  notices of right to sue both JHU and JHHSC. Pursuant to those notices, any lawsuit must be filed by April 2, 2026.

## PARTIES

9.     **Plaintiff Christopher Murdock, M.D.** is a Black physician residing in Tallahassee, Florida. Dr. Murdock received his medical degree from the Miller School of Medicine at the University of Miami in 2022. On March 24, 2022, Dr. Murdock matched into the JHU orthopedic surgery residency program.

10.     **Defendant Johns Hopkins University ("JHU")** is a private institution of higher learning for undergraduate and graduate studies located in Baltimore, Maryland. JHU operates the Johns Hopkins School of Medicine. JHU

employed Dr. Murdock as an orthopedic surgery resident from on or around July 1, 2022 through January 10, 2025.

11.    **Defendant Johns Hopkins Health System Corporation ("JHHSC")** is a not-for-profit organization that serves as the umbrella entity for the Johns Hopkins Hospital and other affiliated hospitals and health care facilities. It is based in Baltimore, Maryland. At all relevant times, JHHSC was a joint employer of Dr. Murdock within the meaning of Title VII and 42 U.S.C. § 1981. Specifically, JHHSC exercised significant control over the terms and conditions of Dr. Murdock's employment in that: (a) Dr. Murdock performed his clinical duties exclusively in hospitals and clinical facilities owned and operated by JHHSC; (b) JHHSC credentialed and privileged Dr. Murdock to practice medicine within its facilities, and controlled his ability to perform clinical work; (c) Dr. Murdock's day-to-day clinical supervision was provided by attending physicians operating within and subject to the authority of JHHSC; (d) JHHSC controlled Dr. Murdock's clinical schedule, rotation assignments, and hours of work within its facilities; (e) JHHSC maintained credentialing and clinical performance records relating to Dr. Murdock; and (f) upon Dr. Murdock's termination, JHHSC revoked, or caused to be revoked, his hospital credentials and access to its facilities, thereby participating directly in the execution of the termination.

12.    **Jessica Bienstock, M.D.**, **MPH** is a Professor of Gynecology and Obstetrics at the JHU School of Medicine. During the relevant time period, Dr. Bienstock was the Senior Associate Dean for Graduate Medical Education and Designated

Institutional Official ("DIO") for JHU. In that role, she was responsible for the oversight and integrity of all graduate medical education programs at JHU, including the orthopedic surgery residency program, and exercised authority over significant adverse actions against residents, including terminations. Dr. Bienstock oversaw the implementation of Dr. Murdock's term of probation, and also participated in the OIE investigation of Dr. Murdock. Dr. Bienstock had a close personal friendship with Dr. Levin, a relationship that compromised her ability to provide neutral institutional oversight of his conduct toward Dr. Murdock.

13.     **Defendant James Ficke, M.D.** is a Professor of Orthopedic Surgery and the Director of the Orthopedic Surgery Department at the JHU School of Medicine. He is also the Orthopedist-in-Chief at the Johns Hopkins Hospital. At all relevant times, Dr. Ficke exercised supervisory and institutional authority over the orthopedic surgery residency program, including authority over decisions regarding residents' advancement, discipline, and termination. Dr. Ficke personally participated in the decision to terminate Dr. Murdock and signed the letter communicating that decision.

14.     **Defendant Dawn LaPorte, M.D.** is a Professor of Orthopedic Surgery, the Vice Chair of Education in the Orthopedic Surgery Department, and the Orthopedic Surgery Residency Program Director at the JHU School of Medicine. As Program Director, Dr. LaPorte exercised direct authority over the residency program, including oversight of resident evaluations, remediation decisions, and termination. Dr. LaPorte personally participated in the decision to terminate Dr. Murdock, signed

the letter communicating that decision, and was the recipient of Dr. Murdock's October 20, 2023 protected complaint about racially disparate treatment within the program.

15.     **Defendant Adam Levin, M.D.** is an Associate Professor of Orthopedic Surgery and the Vice Chair of Faculty Development in the Department of Orthopedic Surgery at the JHU School of Medicine. At all relevant times, Dr. Levin was a member of the Clinical Competency Committee, which had authority to place residents on probation and to recommend their dismissal from the program. Dr. Levin personally submitted a series of racially motivated negative evaluations of Dr. Murdock, including evaluations submitted during periods when the two had no professional contact, and exercised influence over the decisions that ultimately led to Dr. Murdock's termination.

**FACTUAL ALLEGATIONS**

## I.     Dr. Murdock matches with JHU and immediately encounters evidence of racial bias.

16.     Dr. Murdock graduated from the Miller School of Medicine at the University of Miami in 2022. At that time, he was already an accomplished and prolific researcher and academic: he had been a contributing author on at least five peer-reviewed publications, was the lead author on two book chapters, and had given more than a dozen peer-reviewed presentations. He also had worked with, and secured letters of recommendation from, highly regarded orthopedic surgeons.

17.     Dr. Murdock matched into JHU's orthopedic surgery residency program on March 24, 2022. Orthopedic surgery is one of the most competitive specialties in

medicine, and the orthopedic surgery program at JHU is among the most prestigious, routinely ranking among the top 25 in the country.

18. That same day, Dr. Murdock received a phone call from another Black resident at JHU ("Dr. One") who warned that the program had struggled recently with issues of race.

19. A few months later, in June 2022, and before Dr. Murdock had formally started working as a resident, another doctor who worked at JHU ("Dr. Two") cautioned Dr. Murdock that "people like us" could have difficulties at JHU. Given the context of the conversation, Dr. Murdock understood Dr. Two to be referring to Black physicians.

20. That same night, at a JHU social event, Dr. Murdock met with Dr. Adam Levin, the newly appointed Vice Chair of Faculty Development in the Orthopedic Surgery Department. Dr. Levin told Dr. Murdock that he was the only person at the event who Dr. Levin did not know, that Dr. Murdock was "different than everyone else," and that Dr. Murdock would need to prove himself to Dr. Levin and others in the program.

21. Several days later, Dr. Murdock attended another JHU social event. There, the associate director of the orthopedic residency program, Dr. Babar Shafiq, asked Dr. Murdock how he had become interested in orthopedics as a field. When Dr. Murdock referenced his two mentors—one a Black man who received his M.D. from Howard University and his M.B.A. from the University of Pittsburgh ("Mentor One"), and the second a Black man who received his M.D., magna cum laude, from

Harvard Medical School, and his Ph.D. in biochemical engineering/biotechnology from M.I.T. ("Mentor Two")—Dr. Shafiq dismissed them as "politicians" and asked whether Dr. Murdock would be of a similar mindset.

22.    On August 1, 2022, the first day of his first orthopedics rotation, Dr. Murdock again had a racially tinged encounter with Dr. Levin. During that conversation, Dr. Levin asked Dr. Murdock who had written his letters of recommendation. When Dr. Murdock responded that Mentor One and Mentor Two had, Dr. Levin was dismissive, as Dr. Shafiq had been. Dr. Levin told Dr. Murdock that Mentor One was "not qualified" for the recently vacated chair position at the east coast medical school where he was then teaching and that Mentor Two was "too arrogant for his own good." (Mentor One is now the chair of the department of orthopedic surgery at the university in question. Mentor Two has had a long, distinguished career. He is currently a professor of orthopedic surgery and a professor of chemical engineering at a university on the east coast, where he was also previously the dean of the medical school.)

23.    As Dr. Murdock would soon learn firsthand, Dr. Levin had a reputation for anti-Black racism among the Black doctors at JHU. During his time at JHU, at least three other Black physicians—Dr. One, Dr. Three, and Dr. Four—told Dr. Murdock about their own experience with Dr. Levin's racial bias.

24.    For instance, Dr. One explained that their white colleagues did not have to prove themselves in the same way as Dr. One did to earn Dr. Levin's trust and respect when working as a resident under him. This meant that Dr. Levin did not

allow Dr. One as much time participating in more advanced and interesting procedures in the operating room.

25.    Dr. Three informed Dr. Murdock that in the context of recruiting residents to JHU, Dr. Levin would routinely downplay the accomplishments of Black applicants, and express preference for non-Black candidates.

26.    And Dr. Four complained to Dr. Murdock that Dr. Levin was disproportionately aggressive and severe with them, as compared to non-Black residents. For example, Dr. Levin would often send Dr. Four aggressive text messages, engage in excessively harsh criticism, and generally provide far less accommodation or understanding than he would for the non-Black residents.

## II.    Dr. Murdock begins his residency and Dr. Levin starts a sustained campaign of racially motivated negative evaluations.

27.    Dr. Levin's hostility toward Dr. Murdock extended beyond social settings.

28.    In September 2022, Dr. Murdock finished his first orthopedic surgery rotation, supervised by Dr. Levin. At the conclusion of that rotation, Dr. Levin submitted a scathing evaluation. Dr. Levin claimed that Dr. Murdock needed to improve "documentation and presentation accuracy," that there had been "numerous instances of grossly inaccurate documentation," and that Dr. Murdock's "patient care borders on reckless."

29.    In March 2023, after a second rotation working together, Dr. Levin gave Dr. Murdock another negative evaluation. This time, Dr. Levin criticized Dr. Murdock as "behind expectations," citing supposed deficits in critical thinking,

differential diagnosis, and surgical skills. Dr. Levin did not provide evidence to support his conclusion.

30.   About two weeks later, at the end of March 2023, and despite not having worked together during the intervening period, Dr. Levin entered another evaluation of Dr. Murdock—a ghost evaluation. This time, Dr. Levin claimed that Dr. Murdock was "far off" from expectations in work ethic, attentiveness, patient care, and knowledge, and accused Dr. Murdock of being "highly deficient" in knowledge and surgical skills. As before, Dr. Levin did not buttress his conclusions with specific evidence.

31.   Then, in April 2023, again without having worked any further with Dr. Murdock, Dr. Levin submitted a second ghost evaluation. This time he claimed that Dr. Murdock was "still significantly behind basic expectations." Dr. Levin again provided no concrete evidence to support this evaluation.

32.   Notably, Dr. Levin's evaluations—along with subsequent evaluations by other doctors—were entered into JHU's New Innovations platform anonymously. Thus, Dr. Levin and the other evaluators had reason to believe that Dr. Murdock would never know their identities. It was only when Dr. Murdock specifically requested the information from JHU that he learned who was responsible for each evaluation.

33.   The pattern of Dr. Levin's evaluations—uniformly negative, unsupported by evidence, and in two instances submitted without any contemporaneous professional contact with Dr. Murdock—suggests a racially

motivated effort to build a paper record against him rather than a good-faith assessment of his clinical performance.

### III.     Other senior physicians praise Dr. Murdock's work, contradicting Dr. Levin's characterizations.

34.     As Dr. Levin harshly criticized Dr. Murdock's academic and clinical performance, other senior physicians praised Dr. Murdock's work.

35.     On September 26, 2022, Pedro Mendez-Tellez, an assistant professor of anesthesiology, evaluated Dr. Murdock as "dependable, a team player, [and] well prepared for rounds."

36.     On March 10, 2023, Dr. Mariuxi Manukyan, an assistant professor of surgery, commented that Dr. Murdock prepared his notes "in a timely fashion," and that he was a "hard worker" who was "very involved" to the point that he was "often mistaken for a categorical surgical intern based on his level of engagement."

37.     On February 23, 2023, Dr. Christopher Abularrage, a professor of surgery, wrote that Dr. Murdock was "a pleasure to work with."

38.     And on March 8, 2023, Dr. Jeremy Kauffman, a fellow in general surgery, affirmed that Dr. Murdock was "dependable."

39.     These evaluations—from physicians outside the orthopedic surgery department, who had no apparent motive to favor Dr. Murdock—paint a picture of a resident who was performing capably and developing professionally, contradicting Dr. Levin's characterizations.

40.     If Dr. Murdock's "patient care border[ed] on reckless" as Dr. Levin alleged, others would have noticed. None did.

**IV.   Program leadership acknowledges the racial climate at JHU while doing nothing to change it.**

41.   Program and departmental leadership knew about the racial environment in the orthopedic residency program. Dr. LaPorte, the Program Director, told Dr. Murdock that the program needed to work on being a safe and welcoming place for "people like you." Dr. Ficke, the Department Chair, similarly expressed to Dr. Murdock his desire to see "people like you" complete the program at JHU, and advised Dr. Murdock that to accomplish that he should simply aim to "comply and graduate."

42.   Dr. Three told Dr. Murdock that JHU was attempting to push him out and that Dr. Three believed those efforts were racially motivated. Dr. Three told Dr. Murdock that he believed people in the program were targeting him and explained that Dr. Murdock only had two options. He could let the hostility wear him down, or—like Jackie Robinson or Dr. Martin Luther King, Jr.—look to rise above the racial hostility surrounding him and excel despite it.

43.   Despite acknowledging that the program had a problem with race, neither Dr. LaPorte nor Dr. Ficke took corrective action. Dr. Levin continued to supervise and evaluate Dr. Murdock. The racial environment that both program leaders acknowledged persisted.

44.   The statistical record reflects the program's failure. Of the twenty-eight residents hired in the four classes following Dr. Murdock's class, only two are Black. This dramatic underrepresentation of Black physicians in the program following

Dr. Murdock's termination is consistent with a culture that systematically discourages and disadvantages Black residents.

**V.     Despite the mixture of positive and negative evaluations, in March 2023 Dr. Murdock is improperly subjected to JHU's remediation policy and procedures.**

45.     In March 2023, at around the same time Dr. Levin wrote his ghost evaluations, Dr. Murdock met with Dr. LaPorte and received a "formal letter of counseling." That letter set out several purported areas of concern and established metrics by which progress would be monitored. The letter advised that there would be a reassessment in four months and that there could be escalation if sufficient progress had not been made.

46.     After receiving the letter of counseling, Dr. Murdock received a series of positive evaluations.

47.     For example, in September and October 2023, Dr. Murdock performed multiple procedures with Dr. Vishal Hegde, an assistant professor of orthopedic surgery.

48.     Following a total knee arthroplasty on September 21, Dr. Hegde wrote that Dr. Murdock was "doing a great job growing your fund of knowledge." The next week, after a total hip arthroplasty, Dr. Hegde observed that "I can see you are continuing to improve your [operating room] technical skills and efficiency."

49.     On October 4, following another total knee arthroplasty, Dr. Hegde noted that Dr. Murdock was "continuing to improve in the [operating room], which is great."

50.     And after yet another total knee arthroplasty on October 10, Dr. Hegde told Dr. Murdock that his "performance was much improved from previous cases."

## VI. On October 20, 2023, Dr. Murdock meets with Dr. LaPorte to express concerns about his treatment within the residency program.

51.     On October 20, 2023, Dr. Murdock met with Dr. LaPorte to formally raise concerns about racially disparate treatment he had observed within the orthopedic surgery residency program. In that meeting, Dr. Murdock identified specific ways in which he and other Black residents were being treated more harshly than their non-Black peers. He requested that the inequities be addressed. That complaint constituted protected activity under Title VII, 42 U.S.C. § 1981, and MFEPA.

52.     Dr. Murdock highlighted at least four ways in which he, and his fellow Black residents, were being treated more harshly than the non-Black residents. First, he and the other Black residents did not receive the same leeway that the non-Black residents received when it came to amending or correcting their medical notes, resulting in more negative evaluations, as compared to the non-Black residents. Second, when on call, Black residents were held responsible for any mistakes made by the supervising chief residents, in a way that non-Black residents were not. Third, Black residents were given more call shifts and other burdensome responsibilities than their non-Black peers. Finally, Black residents were blamed disproportionately for mistakes made by other residents, as compared to non-Black residents. In sum,

Dr. Murdock explained to Dr. LaPorte that the non-Black residents were set up for success in a way that he, and the other Black residents, were not.

**VII.  Following his meeting with Dr. LaPorte, Dr. Murdock receives additional negative evaluations and is subjected to further remediation.**

53.     The response to the October 20 meeting with Dr. LaPorte was swift and unmistakable.

54.     First, despite the recent positive assessments he had received from Dr. Hegde, on October 26, 2023, Dr. Murdock received a "notice of concern," from Dr. LaPorte. That letter indicated that, in the eyes of the Clinical Competency Committee (comprised of Dr. LaPorte, Dr. Levin, Dr. Greg Osgood, Dr. Shafiq, and Dr. Sophie Strike), Dr. Murdock's performance was unsatisfactory. It repeated many of the points from the letter of counseling, noting that Dr. Murdock's evaluations "raised serious concerns about [his] professionalism, knowledge base, and the care [he] provide[d], particularly about patient safety." There was no mention in the notice of concern of any of the countervailing, positive, evaluations of Dr. Murdock.

55.     Second, almost immediately after his meeting with Dr. LaPorte, Dr. Murdock began receiving negative evaluations from attending physicians in the orthopedic surgery department who had not previously evaluated him negatively. Before October 20, 2023, the only negative evaluations Dr. Murdock had received were from Dr. Levin. But within days of his protected complaint, and continuing thereafter, a pattern of negative evaluations from other attending physicians began to emerge.

56.     On October 28, 2023—eight days after Dr. Murdock's meeting with Dr. LaPorte—Dr. Alice Hughes, an orthopedic trauma surgeon, evaluated Dr. Murdock. She commented that Dr. Murdock was "behind where I would expect him to be compared to his co-residents." When Dr. Hughes next evaluated Dr. Murdock, on February 12, 2024, she opined that, from her perspective, "[Dr. Murdock] did not reach a point in the rotation where he could move on to the next level. He was unreliable and his knowledge base was lacking."

57.     Dr. Andrew Cosgarea, a specialist in sports medicine, submitted an evaluation of Dr. Murdock on December 20, 2023. At that time, Dr. Cosgarea stated that Dr. Murdock was "lagging substantially" behind his classmates "in his orthopedic knowledge, preparation for the operating room, demonstration of surgical skill, utilization of arthroscopy simulation equipment, perioperative patient care and communication with faculty." On January 8, 2024, Dr. Cosgarea characterized Dr. Murdock as having "struggled during the rotation" and having "required substantially more supervision than his PGY-2 peers."

58.     On March 2, 2024, Dr. Paul Sponseller, then the Chair of Pediatric Orthopedics, opined that Dr. Murdock's "knowledge base is far below appropriate level for [his] peers" and that "there is evidence that he does not keep up with the recommended reading" and "his surgical skills and decision-making are below standard."

59.     This sudden shift in the evaluation pattern—from a single detractor before October 20, 2023, to multiple attending physicians issuing uniformly negative

evaluations after that date—is not explained by any change in Dr. Murdock's performance. It is consistent with a coordinated retaliatory response to his protected complaint.

60.     On March 28, 2024, Dr. Murdock received written notice that he had formally been placed on probation based on the accumulation of negative evaluations that followed his protected complaint. Dr. Bienstock was the only person copied on the letter, demonstrating her involvement in, and awareness of, the discriminatory and retaliatory action taken against Dr. Murdock.

61.     In her role as Senior Associate Dean and DIO, Dr. Bienstock played an integral role in Dr. Murdock's probationary term. She participated in all meetings related to the implementation of probation, and specifically mandated that Dr. Murdock attend Employment Assistance Program ("EAP") counseling sessions.

62.     Then, on June 17, 2024, the Clinical Competency Committee advised Dr. Murdock that he would not advance with his class to Post-Graduate Year (PGY) 3. Instead, Dr. Murdock would be offered an opportunity to repeat PGY-2. Again, Dr. Bienstock was the sole person copied on the letter.

63.     Dr. Murdock was placed on this remedial pathway for racially biased reasons—not lack of progress. Several facts confirm this.

64.     First, none of the remedial notices—the letter of counseling, the notice of concern, the probation letter—identified a single specific instance in which a patient was harmed or nearly harmed under Dr. Murdock's care. If the patient safety

concerns were genuine, one would expect at least one concrete example to appear somewhere in the record. None does.

65.    Second, despite purportedly harboring serious concerns about Dr. Murdock's ability to safely care for patients, the Defendants continued throughout this period to assign Dr. Murdock to on-call duties that required him to care for significant numbers of patients overnight, without immediate oversight or supervision. An institution that genuinely believed a resident posed a risk to patient safety would not continue to assign that resident to unsupervised overnight patient care. The Defendants' willingness to do so is fundamentally inconsistent with the patient safety rationale they invoked and confirms that the stated basis for the adverse actions was pretextual.

66.    Finally, the evaluations themselves, which provided the primary basis for placing Dr. Murdock on the remedial pathway, were tainted by racial bias. The foundation of the case against Dr. Murdock rested on the evaluations of Dr. Levin, whom several doctors have identified as racist. And Dr. Levin's pattern of submitting multiple negative evaluations of Dr. Murdock—including two ghost evaluations— confirms improper motives on his part. Furthermore, the remainder of the negative evaluations of Dr. Murdock came only after he voiced his concerns about disparate treatment to Dr. LaPorte. No legitimate remediation process could rest on evaluations tainted by racial bias and retaliatory efforts.

**VIII. The Defendants rely on a pretextual basis to terminate Dr. Murdock.**

67.    In May 2024, Dr. Murdock received notice that JHU's Office of Institutional Equity ("OIE") was investigating alleged violations of JHU's Non-Title IX Sexual Misconduct Policy. The allegations related to a single social event in January 2024—an off-campus gathering following on-campus residency interviews— at which Dr. Murdock was alleged to have touched two women over their clothes and made an offensive comment to a third. Dr. Murdock categorically denies these allegations.

68.    Dr. Bienstock again played an active role in the OIE investigation. She was present at every proceeding attended by Dr. Murdock. It stands to reason that, in her role as Senior Associate Dean and DIO, Dr. Bienstock both influenced the direction of the investigation and was apprised of all developments as they occurred.

69.    On January 10, 2025, Dr. Murdock received a letter, signed by Dr. Ficke and Dr. LaPorte, informing him that the OIE had substantiated the claims against him and terminating him from the residency program, effective immediately. Dr. Bienstock was copied on the letter, demonstrating once again her direct involvement in the discriminatory and retaliatory actions taken against Dr. Murdock.

70.    At the time that Dr. Murdock was investigated by the OIE, JHU had procedures in place governing the treatment of "other sexual misconduct," which is conduct that does not fall within the ambit of Title IX.[1] The policy directed that the

---

[1] *See* Johns Hopkins University, *Appendix H: Procedures for Other Sexual Misconduct, Effective October 1, 2022–July 31, 2024,* https://oie.jhu.edu/wp-

administration "will impose sanctions that are fair and appropriate, consistent with the University's handling of similar cases, adequate to protect the safety of the campus community, and reflective of the seriousness of the misconduct at issue."[2] The policy listed a range of possible sanctions "any one or more" of which could be imposed "as the circumstances may dictate."[3] Those sanctions include: (1) reprimand or warning; (2) disciplinary probation; (3) imposition of conditions of employment; (4) mandatory training; (5) alcohol and/or drug assessment or counseling; (6) pay reduction; (7) suspension; and (8) dismissal.[4]

71.    The Defendants' decision to impose the most punitive of the available sanctions, and thereby terminate Dr. Murdock, is extraordinary and unprecedented. We have found no evidence that a JHU medical resident has *ever* been terminated for the same or similar conduct, without less severe sanctions being imposed first. The decision to bypass every intermediate sanction and proceed directly to termination was not compelled by JHU's policy, was not consistent with JHU's historical practice, and cannot be explained by the nature of the alleged conduct alone.

72.    The termination was pretextual. The OIE investigation provided the Defendants with a convenient mechanism to accomplish what the discriminatory and

---

content/uploads/sites/22/Appendix-H-Procedures-for-Other-Sexual-Misconduct-effective-October-1-2022-July-31-2024.pdf.

[2] *Id.* at 8.

[3] *Id.*

[4] *Id.* at 8–9.

retaliatory evaluation process had been building toward: the permanent removal of a Black physician who had complained about racial bias in the program. The decision to impose the harshest available sanction, rather than any of the lesser alternatives explicitly provided by JHU's own policy, was motivated by racial animus and/or retaliation for Dr. Murdock's protected complaint.

**IX.    Since his unlawful termination, Dr. Murdock's career has been severely and adversely impacted, and the Defendants have impeded his ability to investigate his legal claims.**

73.    The consequences of Dr. Murdock's termination have been severe and career-derailing. Termination from residency is uniquely stigmatizing in medicine and can permanently foreclose specialized practice, and the Defendants' misconduct predictably derailed Dr. Murdock's career.

74.    Before and after termination, Dr. Murdock sought to transfer to other orthopedic residency programs but was advised by physicians that the Defendants communicated with third parties about the OIE investigation and underlying allegations, and that he should "assume everybody you talk to knows" about them, which would impede transfer to another program. Despite multiple attempts, Dr. Murdock was unable to secure another residency position.

75.    Since his termination, Dr. Murdock has sought the services of undersigned counsel to investigate and litigate the instant claims. Through counsel, Dr. Murdock has attempted to speak with witnesses connected to the OIE investigation. Certain witnesses either declined to speak with counsel or, having initially cooperated, abruptly ceased doing so.

76.     It appears that JHU and JHHSC—large, influential, and well-resourced entities with a vested interest in protecting their reputations—took active steps to impede Dr. Murdock's ability to investigate and substantiate his legal claims. Specifically, it appears JHU and JHHSC discouraged, pressured, or otherwise interfered with potential witnesses who possessed knowledge of the discriminatory and retaliatory conduct alleged, as well as the OIE investigation, preventing or delaying those witnesses from cooperating with Dr. Murdock's counsel's investigation.

77.     This conduct was not new. During the OIE investigation, for instance, the Defendants prohibited Dr. Murdock from interviewing witnesses (and even hid their identities). The Defendants stopped Dr. Murdock from reviewing investigative documents in a meaningful manner. With this secret evidence, the Defendants found Dr. Murdock in violation of OIE policy.

78.     The pattern of concealment extended to, indeed began with, the evaluations of Dr. Murdock's medical work, which were done anonymously. And at least two of those were "ghost evaluations"—negative evaluations by Dr. Levin when Dr. Murdock was not even under Dr. Levin's supervision. The Defendants took advantage of that anonymity to conceal their misconduct and unlawfully end Dr. Murdock's career at JHU.

79.     Taken together, these efforts reflect a sustained and deliberate effort by the Defendants to ensure that Dr. Murdock could neither understand nor effectively challenge the conduct that cost him his position and derailed his career.

## FEDERAL CLAIMS

### Count I (42 U.S.C. § 2000e et seq.)
### Racial Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964
### (Against JHU and JHHSC)

80.    Dr. Murdock realleges and incorporates the prior paragraphs.

81.    Dr. Murdock is a member of a protected class on the basis of his race (Black).

82.    Dr. Murdock was qualified for his position and performed his duties competently, as reflected by the positive reviews he received.

83.    JHU and JHHSC subjected Dr. Murdock to one or more adverse employment actions, including, but not limited to: subjecting him to a racially biased evaluation process; placing him on a remediation pathway; placing him on probation; denying him advancement with his class; terminating his employment.

84.    The circumstances surrounding Dr. Murdock's termination give rise to an inference of unlawful discrimination, including: Dr. Levin's documented pattern of racially motivated evaluations; the acknowledgment by program leadership that the residency program had failed to provide a welcoming environment for Black physicians; the statistical underrepresentation of Black residents in the program; the lack of any specific evidence supporting the most serious characterizations in Dr. Levin's evaluations; and the unprecedented severity of the termination sanction relative to JHU's historical practice.

85.    JHU and JHHSC terminated Dr. Murdock because of or motivated by his race, in violation of Title VII.

86.     As a direct and proximate result of the institutional Defendants' actions, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all legal and equitable relief available under Title VII, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that the Court deems just and proper.

**Count II (42 U.S.C. § 2000e et seq.)**
**Retaliation in Violation of**
**Title VII of the Civil Rights Act of 1964**
**(Against JHU and JHHSC)**

87.     Dr. Murdock realleges and incorporates the prior paragraphs.

88.     On October 20, 2023, Dr. Murdock engaged in protected activity by formally complaining to Dr. LaPorte about racially disparate treatment of Black residents in the orthopedic surgery residency program.

89.     Defendants were aware of Dr. Murdock's protected complaint. Dr. LaPorte received it directly. The substance of Dr. Murdock's complaint must have been known to other members of the orthopedic surgery department, including attending physicians who subsequently evaluated him, as well as to Dr. Bienstock.

90.     Following Dr. Murdock's protected complaint, Defendants and others subjected him to a series of adverse employment actions, including: numerous negative evaluations beginning immediately after October 20, 2023; the probation letter of March 28, 2024; the non-advancement decision of June 17, 2024; and the termination of January 10, 2025.

91.    The causal connection between Dr. Murdock's protected complaint and the subsequent adverse actions is evidenced by: the close temporal proximity between the October 20 complaint and the onset of negative evaluations from previously neutral attending physicians; the stark contrast between the evaluation pattern before and after the protected complaint; and the accumulation of adverse actions that culminated in termination after Dr. Murdock raised race discrimination concerns.

92.    The institutional Defendants' retaliatory conduct was the but-for cause of the adverse employment actions described herein, in violation of Title VII.

93.    As a direct and proximate result of Defendants' actions, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all legal and equitable relief available under Title VII, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that the Court deems just and proper.

## Count III (42 U.S.C. § 1981)
## Racial Discrimination in the
## Making and Enforcing of Contracts
## (Against All Defendants)

94.    Dr. Murdock realleges and incorporates the prior paragraphs.

95.    Dr. Murdock is a member of a protected racial group.

96.    Dr. Murdock had an employment contract and contractual relationship with JHU and/or JHHSC from Dr. Murdock's residency appointment and continued employment. That contractual relationship is protected by 42 U.S.C. § 1981.

97.    All Defendants intentionally discriminated against Dr. Murdock on the basis of race with respect to the making, performance, modification, and termination of Dr. Murdock's employment relationship.

98.    The individual Defendants— Dr. Bienstock, Dr. Ficke, Dr. LaPorte, and Dr. Levin—each personally participated in the discriminatory conduct described herein, including by submitting or relying upon racially biased evaluations, maintaining a discriminatory remediation process, and executing or authorizing the termination decision.

99.    As a direct and proximate result of Defendants' actions, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all legal and equitable relief available under § 1981, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that the Court deems just and proper.

**Count IV**
**42 U.S.C. § 1981**
**Retaliation**
**(Against All Defendants)**

100.    Dr. Murdock realleges and incorporates the prior paragraphs.

101.    Dr. Murdock engaged in protected activity under § 1981 by complaining on October 20, 2023, about racially discriminatory treatment in the orthopedic surgery residency program.

102.   Defendants subjected Dr. Murdock to adverse employment actions in retaliation for that protected complaint, as described above, including the pattern of negative evaluations, probation, non-advancement, and termination that followed.

103.   Defendants' retaliatory conduct was the but-for cause of the adverse employment actions. The individual Defendants each personally participated in the retaliatory conduct.

104.   As a direct and proximate result of Defendants' retaliatory conduct, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all available relief under § 1981, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and such other relief as the Court deems just and proper.

### STATE CLAIMS

### Count V (Md. Code Ann., State Gov't § 20-601 et seq.)
### Racial Discrimination in Violation of
### Maryland Fair Employment Practices Act
### (Against JHU and JHHSC)

105.   Dr. Murdock realleges and incorporates the prior paragraphs.

106.   JHU and JHHSC are "employers" as defined by the Maryland Fair Employment Practices Act ("MFEPA").

107.   JHU and JHHSC discriminated against Dr. Murdock because of race, in violation of MFEPA, including by subjecting him to a racially biased evaluation process, placing him on probation, denying him advancement, and terminating his employment.

108.    As a direct and proximate result of the institutional Defendants' actions, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all legal and equitable relief available under MFEPA, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that the Court deems just and proper.

**Count VI (Md. Code Ann., State Gov't § 20-601 et seq.)**
**Retaliation in Violation of**
**Maryland Fair Employment Practices Act**
**(Against JHU and JHHSC)**

109.    Dr. Murdock realleges and incorporates all prior paragraphs.

110.    Dr. Murdock engaged in protected activity under MFEPA by complaining about racially discriminatory treatment on October 20, 2023.

111.    JHU and JHHSC retaliated against Dr. Murdock for that protected complaint by subjecting him to the adverse employment actions described above, in violation of MFEPA.

112.    As a direct and proximate result of the institutional Defendants' retaliatory conduct, Dr. Murdock has suffered and continues to suffer lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other compensable damages. He seeks all available relief under MFEPA, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that the Court deems just and proper.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment against the Defendants and an award of the following relief:

- A declaration that Defendants' conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Maryland Fair Employment Practices Act;

- An award of back pay, including lost wages, salary, and employment benefits, with pre-judgment interest as allowed by law;

- An award of front pay in lieu of reinstatement, or reinstatement to a comparable position, as appropriate;

- Compensatory damages for loss of future earning capacity, as well as emotional distress, humiliation, inconvenience, loss of reputation, and other economic and non-economic injuries, as permitted by law;

- Punitive damages under 42 U.S.C. § 1981 and any other applicable law, to punish Defendants' willful and malicious conduct and to deter similar conduct in the future;

- An award of reasonable attorneys' fees, expert fees, and costs pursuant to Title VII, 42 U.S.C. § 1988, the MFEPA, and any other applicable authority;

- Pre-judgment and post-judgment interest as allowed by law;

- Such other legal and equitable relief as the Court deems just and proper.

-31-

## JURY DEMAND

Plaintiff demands a trial by jury under Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

_____

Kobie Flowers
kflowers@flowerskeller.com
Doug Keller
dkeller@flowerskeller.com

Flowers Keller LLP
1601 Connecticut Avenue, NW
Washington, D.C. 20009
(202) 521-8742

*Attorneys for Dr. Christopher Murdock*